**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROMEO JACKSON, | ) | |
| *Plaintiff*, | ) | |
| v. | ) | No. 22 C 1297 |
| WEXFORD HEALTH SOURCES, INC.; DAVID GOMEZ; LUCESITA GALINDO; AND LILYBETH SEGARRA, | ) | Chief Judge Virginia M. Kendall |
| *Defendants*. | ) | |

**MEMORANDUM, OPINION AND ORDER**

Plaintiff Romeo Jackson, while incarcerated at Stateville Correctional Center ("Stateville"), experienced delays in receiving his prescriptions medication, Protonix and Reglan, which he took to manage symptoms of Gastroesophageal Reflux Disease ("GERD"). (Dkt. 189 at 1). Jackson brought a civil rights action under 42 U.S.C. § 1983 against Defendants Lilybeth Segarra, Wexford Health Sources ("Wexford"), David Gomez, and Lucesita Galindo. (Dkt. 33). Defendants Segarra and Wexford (collectively, the "Wexford defendants"), and Defendants Gomez and Galindo (collectively, the "IDOC defendants") now move for summary judgment, contending no Eighth Amendment violations took place. (Dkt. 154, Dkt. 157).[1] Because no genuine issue of material facts exists for any of Jackson's remaining claims, the Court grants the Defendants' motions for summary judgment.

[1] The Court discusses the Wexford and IDOC defendants' motions for summary judgment in one order as the two cases have overlapping, relevant facts.

## BACKGROUND

Jackson was an inmate at Stateville during the time relevant to this lawsuit. (Dkt. 176 at 2). While at Stateville, Jackson took Protonix and Reglan, both non-formulary medications that require "periodic renewal by a licensed physician," to help him avoid feeling a "consistent choking sensation" that took place from GERD. (Dkt. 180 ¶ 14). To provide inmates proper medication, Stateville contracted with various healthcare entities. The Illinois Department of Correction ("IDOC") contracted with Wexford to, among other things, administer medicine to inmates at Stateville. (Dkt. 33 ¶ 15). Wexford then subcontracted with Boswell Pharmacy ("Boswell") which supplied Stateville inmates with prescription medication. (Dkt. 180 ¶ 9).

For an inmate to obtain medication, he was required to see a physician who held a license to prescribe the necessary medicine. (Dkt. 155, Ex. 2 at 30-32). Once an inmate had a prescription, pharmacy technicians or medical assistants would order the inmate's medicine. (Dkt. 178, Ex. H at 62). Boswell primarily filled the inmate's prescription orders and delivered them to Stateville. (Dkt. 180 ¶ 4). If a patient ran out of medicine, the Health Care Unit (HCU) could use available stock medication. (Dkt. 180 ¶ 9). When the HCU did not have medication in stock, Stateville had a "provision for obtaining needed medications from a local pharmacy when the urgency of the patient's condition [made] it unacceptable to wait for the medication to be available through the contract pharmacy." (Dkt. 178, Ex. L at 52). A physician was required to make this decision. (*Id.*)

The HCU dealt with the administration of medication. At Stateville, nurses administered medicine in one of two ways: Direct Observation Therapy ("DOT") or Keep on Person ("KOP"). (Dkt. 180 ¶ 29). DOT, the default method, had nurses administer one dose of medicine at a time whereas KOP allowed the inmate to keep multiple doses at once, typically a month's worth of medication. (Dkt. 180 ¶ 31). DOT and KOP medications had different renewal processes. For DOT

medication, the original provider would reassess the inmate's need for medicine once the prescription emptied. (Dkt. 178, Ex. H at 61-62). For KOP renewals, inmates would remove a sticker from their medicine and give it to the nurse, who would in turn deliver it to the pharmacy technicians. (*Id.*) Stateville further classified medication as formulary vs. non-formulary medicine. Doctors prescribed formulary medicine in a "regular" fashion, where the doctor would see the patient, prescribe medication, write the order, and send it to the pharmacy technician for ordering. (*Id.*) Non-formulary medication required two additional approval steps: the pharmacy needed a non-formulary form, and Wexford had to approve this form before the refill could process. (Dkt. 178, Ex. C).

Starting in 2019, Jackson experienced delays in receiving medication prescribed to treat his GERD. (Dkt. 176 at 2). Jackson did not receive Protonix from March 16 to March 19 of 2019, August 12 to August 16 of 2021, September 28 to September 29 of 2021, and October 23 to October 27 of 2021. (Dkt. 176 at 3). Jackson did not receive Reglan from January 23 to January 29 of 2020, February 11 to February 15 of 2021, October 23 to October 27 of 2021, and August 5 to August 9 of 2022. (*Id.*) For each delay, Jackson filed a medical grievance. (*Id.*) Jackson raised concerns about his prescription delays to prison officials, including the Director of Nursing ("DON") Segarra, the warden, Gomez, and the Health Care Administrator ("HCUA") Galindo.

Segarra, the DON, worked at Stateville from February 2021 to August 2021. (Dkt. 180 ¶ 6). Segarra supervised the nursing staff at Stateville. (*Id.* ¶ 10). Segarra and Jackson had at least two interactions during her time at Stateville. First, she reviewed his February 22, 2021, grievance on March 25, 2021. (Dkt. 178, Ex. C). By the time Segarra reviewed the February 22 grievance, Jackson had received his medication. (*Id.*) Second, on August 13, 2021, Jackson informed Segarra,

in person, that he experienced a medication delay. (Dkt. 178, Ex. G). Segarra, in response, told Jackson to leave his name and number with a nurse. (*Id.*)

Gomez, the warden at Stateville, worked at the prison from February 1, 2020, to February 19, 2022. (Dkt. 180 ¶ 3). Like Segarra, Gomez and Jackson interacted during his time as warden. Gomez received a letter from IDOC dated June 2, 2021, discussing Jackson's prescription delays. (Dkt. 195 at 3). Jackson, on August 17, directly wrote a letter to warden Gomez about his missing Protonix. (Dkt. 195 at 4). On October 28, 2021, Gomez received an email with one of Jackson's prescription complaints where Jackson had informed the prison officials he had not received his medication for a week. (Dkt. 159, Ex. 11). Gomez responded by forwarding the email to the Assistant Warden of Programs, Kenneth Osborne, who oversaw Stateville's healthcare services. (*Id.*). Osborne sent the concern to Michelle Smith, the DON at the time, requesting the HCU see Jackson the same night or first thing the following morning. (*Id.*) Smith responded, copying Gomez, by informing him that a doctor had seen Jackson, refilled his prescription, and Jackson had an appointment at the University of Illinois Chicago ("UIC") the following morning. (*Id.*) On December 13, 2021, Gomez received an email from a member of the Administrative Review Board ("ARB") requesting information about Jackson. (*Id.*) Gomez forwarded the email to Galindo, who provided a response regarding his medication status. (*Id.*)

Galindo, the HCUA, worked at Stateville from September 1, 2020, to October 1, 2022. (Dkt. 180 ¶ 4). As the HCUA, Galindo could not prescribe, order, or administer medication, but she was required to ensure inmates received proper medical care, which in turn required her to follow up on inmates' complaints. (Dkt. 194 at 5). Galindo and Jackson interacted on multiple occasions. (Dkt. 195 at 10). During their interactions, Jackson informed Galindo that he had not received his medication in a timely manner. (*Id.*) On August 19, 2021, Galindo received a KITE –

a written form of communication from inmates – from Jackson regarding a prescription concern of his and emailed Osborne about what steps to take next. (Dkt. 159, Ex. 5 at 148). On September 23, 2021, Galindo received correspondence from the Director's Office of the IDOC requesting information on Jackson's medication concerns, which she forwarded to Osborne. (*Id.* at 151-52). On December 14, 2021, Galindo replied to an email from Gomez regarding Jackson's missing medication, in which she explained its delay. (Dkt. 159, Ex 10).

Jackson responded to his unanswered prescription delays by filing this lawsuit in the Northern District of Illinois on March 10, 2022. (Dkt. 1). Jackson filed additional amended complaints. The third amended complaint now comes before the Court on summary judgment. (Dkt. 33). Jackson brings the following claims: § 1983 violation of Jackson's Eighth Amendment Rights against Gomez (Count I), Galindo (Count III), Segarra (Count IV), and Wexford (Count V and VI).[2]

## LEGAL STANDARD

"Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Lee v. Milwaukee Cnty., Wisc.*, 175 F.4th 877, 883 (7th Cir. 2026) (*quoting* Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists "if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Hossfeld v. Allstate Ins. Co.*, 179 F.4th 1046, 1052 (7th Cir. 2026) (*quoting Christense v. Weiss*, 145 F.4th 743, 751 (7th Cir. 2025)). To survive at the motion for summary judgment stage, the "nonmoving party must provide specific material facts showing there is a genuine issue for trial." *Tech. Sec. Integration, Inc. v. EPI Techs., Inc.*, 126 F.4th 557, 560 (7th Cir. 2025). "A party

[2] Jackson brought a § 1983 claim against Kenneth Osborne, but the Court previously dismissed these claims. (Dkt. 73).

who fails to produce evidence sufficient to show an element essential to his case on which he bears the burden cannot survive a summary judgment motion." *Gills v. Hamilton*, 164 F.4th 640, 644 (7th Cir. 2026); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**DISCUSSION**

**I. The Wexford Defendants' Motion for Summary Judgment**

The Wexford defendants move for summary judgment on Jackson's Eighth Amendment claim against Segarra (Count IV), respondeat superior claim against Wexford (Count VI), and *Monell* claim against Wexford (Count V). (Dkt. 154). The Court grants the Wexford defendants' motion for summary judgment for the following reasons.

**a. Lilybeth Segarra**

The Eighth Amendment requires prison officials to provide medical care to prisoners within their custody. *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (*quoting Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021)). "[A] prison official's 'deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment.'" *Id.* (*quoting Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661-62 (7th Cir. 2016)). To determine if an Eighth Amendment violation took place in the prison medical context, courts "'perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition.'" *Id.* (*citing Petties v. Carter*, 836 F.3d 722, 727-728 (7th. Cir. 2016)).

**i. Serious Medical Condition**

A plaintiff must have an "objectively serious medical condition" to prevail on an Eighth Amendment claim in the prison medical context. *See generally McDaniel v. Syed*, 115 F.4th 805, 832 (7th Cir. 2024). "A serious medical condition is one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The Seventh Circuit has previously recognized GERD as a serious medical condition. *Id.*

Jackson testified that a doctor had diagnosed him with GERD and prescribed him medication to treat it. (Dkt. 159, Ex. 1 at 24). Specifically, to help alleviate discomfort that accompanied GERD, Jackson took Protonix and Reglan. (*Id.* at 7). When Jackson did not take these medications, he testified that he could not function due to the constant pain. (*Id.* at 133-34). Jackson stated the discomfort, which took place "24/7" when he did not have his medication, made it difficult for him to breathe as he had a frequent choking sensation in his throat. (*Id.* at 61-62). Under the circumstances described, the Court will assume, for purposes of this motion, that Jackson has a serious medical condition. *See generally Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (denying summary judgment for an objectively serious medical condition because Plaintiff satisfied his burden by alleging his GERD pain "was so intense that he was not able to sleep at night[,] [h]e felt like his insides were being pushed out, and [his] pain was constant.").

**ii. Deliberate Indifference**

To prevail on an Eighth Amendment claim, a plaintiff must also show the defendant acted with deliberate indifference. *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 832 (7th Cir. 2026); *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022) (*quoting Donald v. Wexford Health Sources Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)) (deliberate indifference "occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'"). Jackson alleged Segarra acted with deliberate indifference toward his serious medical condition. Jackson,

however, does not provide adequate evidence to create a dispute of fact over Segarra's mental culpability.

Deliberate indifference first requires evidence that Segarra "*actually* knew of and disregarded a substantial risk of harm" to Jackson's health. *Dean*, 18 F.4th at 241 (*quoting Petties*, 836 F.3d at 728). As to the notice requirement, Jackson provides evidence that he put Segarra on notice on at least two separate instances; first, when she signed off on one of his grievances and second, when they discussed his prescription delays in person. The parties do not dispute that Segarra received and signed off on a grievance from Jackson. (Dkt. 159, Ex. 10). The grievance explicitly informed Segarra that Jackson did not have medication for "approximately 3 days" because his prescription had expired. (*Id.*) Jackson and Segarra, also undisputed, had at least one in person interaction where Jackson informed Segarra that he had not received his medication. (Dkt. 155 at 9). Because Jackson filed grievances and interacted with Segarra directly, the Court presumes that these actions placed Segarra on notice of a sufficient risk of harm to Jackson's health. *Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015) ("[a]n inmate's correspondence to a prison administrator may thus establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation."); *see generally Greeno*, 414 F.3d 645 (complaining to administrative officials, writing inmate complaints and writing letters to administrators regarding inmate's medical condition establishes actual notice on behalf of recipients).

Courts must also "look to the defendants' state of mind to assess whether deliberate indifference exists." *Clemons*, 106 F.4th at 635 (*citing Petties*, 836 F.4th at 727-28). Jackson faces a high bar in establishing deliberate indifference because "'it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Brown v.*

*Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (*quoting Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022)). Neither negligence nor objective recklessness can amount to deliberate indifference. *Barnes v. Wexford Heath Services, Inc.*, 177 F.4th 825, 832 (7th Cir. 2026). Deliberate indifference, rather, requires a mental state akin to criminal recklessness. *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2026).

The Wexford defendants contend that Segarra did not act with deliberate indifference. Segarra worked at Stateville from February 9, 2021, to August 20, 2021. (Dkt. 155 at 7). In her six months of employment, Jackson did not receive his medication on two separate occasions; Jackson did not have his Reglan from February 11 to 15 of 2021 nor did he have his Protonix from August 12 to 16 of 2021. (Dkt. 176 at 3). Beyond the two prescription delays, Jackson has not provided the Court with any other evidence to support his claim of deliberate indifference. Medication delays, standing on their own, do not constitute deliberate indifference. *See Burton v. Downey*, 805 F.3d 776, 785 (holding "a two-day delay [was] not enough, standing alone, to show a culpable mental state."); *see Warman v. Funk*, 119 F. App'x 789, 791 (7th Cir. 2004) (holding "a ten-day delay in filling a medication prescription does not in this case establish deliberate indifference."). Even assuming missing medication on two separate occasions for a total of ten days demonstrates deliberate indifference, Jackson's complaints to Segarra did not fall on "deaf ears." *Fenoglio*, 792 F.3d at 782 (discussing how "repeated requests for relief that fall on 'deaf ears' may suggest deliberate indifference.").

Segarra first received a grievance from Jackson on March 25, 2021. (Dkt 178, Ex. G). Jackson had run out of Reglan on February 10, 2021, because his prescription had expired. (*Id.*) The following day, February 11, the prescriber renewed Jackson's medication as required for non-formulary medicine. (*Id.*) By February 16, Jackson began taking his Reglan once again. (Dkt. 155,

Ex. 1). By the time Segarra reviewed Jackson's grievance on March 25, 2021, Jackson's prescription had already been refilled. (Dkt. 159, Ex. 10). Segarra actively reviewed Jackson's medication administration record ("MAR") to confirm he had received his medication when investigating his grievance. (*Id.*) Segarra then noted Jackson's concerns had resolved. (*Id.*)

Deliberate indifference requires Segarra to "consciously disregard[] a substantial risk of harm." *Rasho*, 22 F.4th at 710. By the time Segarra received *actual* notice of Jackson's grievance, his concern had vanished; Jackson had his Reglan. At best, signing off on the grievance, without further investigation, may constitute negligence. *See e.g. Perez v. Zunker*, 280 F. App'x 528, 530-31 (7th Cir. 2008) (upholding summary judgment on an Eighth Amendment deliberate indifference claim against a nursing coordinator where the coordinator's "only apparent involvement with [plaintiff] was to review his grievance, and in that capacity, she recommended that his grievance be denied because investigation had shown that he was receiving ongoing care for his [medical condition]."). Signing off on a resolved grievance, however, does not reflect "'a total unconcern for the prisoner's welfare in the face of [a] serious risk.'" *Rasho*, 22 F.4th at 710 (*quoting Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2021)).

Jackson informed Segarra about his medication delays again on August 13, 2021. (Dkt. 176 at 21). Segarra, during this encounter, advised Jackson to give his name and number to a nurse who could assist with his prescription delays. (*Id.*) As the DON, with no ability to refill or prescribe medication, Nurse Segarra directed Jackson to the infirmary where someone could resolve Jackson's concerns. *See Jackson v. Pollion*, 733 F.3d 786, 787 (7th Cir. 2013) ("[i]n failing to ascertain whether the medical staff was dealing effectively with the problem, the correctional counselor was at worst negligent, rather than deliberately indifferent[.]"). While Segarra's actions

could, at most, constitute negligence, the law requires a mental culpability far beyond negligence to sustain deliberate indifference claims.

To establish deliberate indifference at the summary judgment stage, Jackson had to put forth evidence indicating Segarra "knew of and disregarded a substantial risk of harm." *Rodgers v. Rankin*, 99 F.4th 415, 419 (7th Cir. 2024) (*quoting Petties v. Carter*, 836 F.3d at 728). He has failed to do so. Viewing the evidence in the light most favorable to Jackson, he, at most, has provided evidence that Segarra acted negligently. "But negligence cannot support a due process violation, which demands a showing of deliberate indifference." *Zemlick v. Burkhart,* 164 F.4th 1004, 1013 (7th Cir. 2026) (*citing Rosario*, 670 F.3d at 821). The Court thus grants the Wexford defendants' motion for summary judgment with respect to Nurse Segarra.

**iii. Wexford**

To the extent Jackson continues to maintain his vicarious liability claim against Wexford, the Court already dismissed this claim, and Jackson provides no basis to revisit it. (Dkt. 73).

**b. Monell Claim**[3]

Jackson's Eighth Amendment claim against Wexford suffers the same fate. Plaintiffs cannot hold municipalities vicariously liable under § 1983 for the constitutional torts of their employees or agents. *Dean*, 18 F.4th at 235 (*citing Monell v. Dep't of Social Services*, 436 U.S. 658 (1978)). "*Monell* governs Wexford's liability in this case" because the Seventh Circuit "treat[s] private corporations acting under color of state law as municipalities." *Id.* To prevail on a *Monell* claim, the plaintiff must first "challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th

[3] The Court does not consider the Lippert report in its *Monell* discussion as Jackson failed to prove a constitutional violation took place. *See Dean*, 18 F.4th at 234 (the Court does not need to discuss the admissibility of the Lippert report when plaintiff failed to prove Wexford acted with deliberate indifference, a key element of *Monell* claims).

Cir. 2021). Second, the plaintiff "must [] prove that the policy or custom demonstrates municipal fault." *Id.* at 987. Third, the plaintiff must "prove that the municipality's action was the 'moving force' behind the federal rights violation." *Id.* at 987 (*quoting Board Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). "In short, a *Monell* plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean*, 18 F.4th at 236.

First, Jackson must suffer a constitutional violation. "A *Monell* plaintiff must establish that he suffered a deprivation of a federal right *before* municipal fault, deliberate indifference, and causation come into play." *First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 987. "[I]f no constitutional violation occurred in the first place, a *Monell* claim cannot be supported." *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014); *see also Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) (recognizing "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."). Jackson fails this initial step. While it is "clear that *Monell* liability does not always require a finding of individual liability[,]" when the "plaintiff's theory of *Monell* liability rests entirely on individual liability, [] negating individual liability will automatically preclude a finding of *Monell* liability." *Whiting*, 839 F.3d at 664. Jackson's theory of *Monell* liability depends on a finding that Segarra acted with deliberate indifference. (Dkt. 175 p. 10-14). Jackson's *Monell* claim relies on the same assertions made against Segarra, which, as discussed above, failed. Because Jackson did not allege separate constitutional violations against Wexford, his *Monell* claim cannot survive. *Petty v. City of Chicago*, 754 F.3d 416, 424-425 (7th Cir. 2014) (*citing Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008)) ("'[i]t is well established that there can be no municipal liability based on an

official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights.'").

Even if Jackson could establish a distinct constitutional violation, when viewing the evidence in the light most favorable to Jackson, he has not shown that a corporate policy, widespread practice, or custom caused his alleged constitutional violations. To support his claim, Jackson provides evidence that he did not receive Reglan and Protonix on ten separate occasions from March 2019 to March 2024. (Dkt. 176 at 3). These ten instances, over five years, provide the sole support for Jackson's *Monell* claim. There are no "bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*[.]" *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). Monell liability, however, does require a number of instances to take place over time. *See e.g., Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (establishing *Monell* liability requires a plaintiff to allege more than three instances of custom or policy violations); *Doe v. Vigo Cnty., Indiana*, 905 F.3d 1038, 1045 (7th Cir. 2018) (recognizing "a handful of incidents spread over twenty years hardly amounts to a widespread custom"); *Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) (holding over the course of eleven months, "evidence of four incidents that [plaintiff] alone experienced 'fail[ed] to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law.'"); *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("a single complaint of four incidents over eleven months is not materially different than three complaints, each of a single incident, over nineteen months."). Ten prescription delays, lasting a matter of two to five days, over a five-year period do not create evidence of a widespread practice or custom.

Furthermore, Jackson makes the mistake of only providing evidence of his alleged constitutional violations. While a prisoner can establish a *Monell* claim by presenting evidence limited to his own violations, "it is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipality at issue, not a random event." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008); *Stockton*, 44 F.4th at 617 ("[t]o establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice, [plaintiff] must point to other inmates injured by that practice."); *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021) (recognizing the difficulty in establishing a *Monell* claim when plaintiff's "allegations stem from the experiences of one person."); *Dean*, 18 F.4th at 214 (plaintiff's *Monell* claim fails, in part, as he did "not offer substantive evidence that collegial review had caused unconstitutional delays for other prisoners[]" and instead, "only offers substantive evidence of collegial review causing unconstitutional delays in his own healthcare[.]").

Jackson's *Monell* claim against Wexford cannot survive the Wexford defendants' motion for summary judgment. Jackson failed to establish a constitutional violation, the baseline requirement for all *Monell* claims. And even if he did, Jackson's evidence did not demonstrate that a widespread practice or custom took place. The Court grants the Wexford defendants' motion for summary judgment on Jackson's *Monell* claim.

## II. The IDOC Defendants' Motion for Summary Judgment

Jackson also brought an Eighth Amendment claim against Defendant Gomez (Count I) and Defendant Galindo (Count III). The IDOC defendants move for summary judgment on Jackson's

Eighth Amendment claim against them. (Dkt. 157). The Court grants the IDOC defendants' motion for summary judgment for both claims.[4]

**a. David Gomez**

The IDOC defendants move for summary judgment on Jackson's Eighth Amendment claim. Jackson claims Gomez acted with deliberate indifference because Gomez knew about Jackson's medication delays and took ineffective steps to rectify the situation. (Dkt. 179 at 4).

The Court assumes Jackson put Gomez on notice based on the evidence provided. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) ("plaintiff must demonstrate that 'the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety.'"). "An inmate's correspondence to a prison administrator may [] establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Fenoglio*, 792 F.3d at 781-82. The parties do not dispute the existence of the following interactions between Gomez and Jackson. On October 28, 2021, Gomez forwarded an email to Osborne where Jackson stated he had been without his medication for a week, and the HCU failed to help him. (Dkt. 159, Ex. 4 at 107). On December 13, 2021, Gomez admitted to receiving an email stating Jackson experienced further delays in receiving his medication. (*Id.*)

Viewing this evidence in the light most favorable to Jackson, the Court accepts that Gomez had *actual* notice of a substantial risk of harm to Jackson. *See Fenoglio*, 792 F.3d at 782 (holding plaintiff's complaint alleged "facts sufficient to form a basis for personal liability against the

---

[4] The IDOC defendants do not contest that Jackson had a serious medical condition, so the Court does not discuss this.

grievance officials for violations of the Eighth Amendment[]" where he alleged defendants' had personal knowledge through his "coherent and highly detailed grievances and other correspondences."); *but see Ollison*, 136 F.4th at 738 (holding plaintiff did not put warden on notice as warden received a single grievance which "stated that a medication change caused him lightheadedness, vomiting, chest pains, and other complications[,]" but "also suggested that he was still going to the recreation area[.]").

Jackson's Eighth Amendment claim against Gomez, therefore, centers on whether he can create a genuine dispute of fact over Gomez's deliberate indifference. Even viewing the evidence in the light most favorable to Jackson, he cannot. Gomez served as the warden of Stateville, as relevant to this lawsuit, from February 1, 2020, to February 29, 2022. (Dkt. 180 at 2). When Gomez worked as Stateville's warden, Jackson, as undisputed by the parties, did not receive his prescribed medication on six separate occasions. (Dkt. 159). Jackson did not receive Protonix from August 12-16, 2021, September 28-29, 2021, and October 23-27, 2021. (*Id.*) Jackson also did not receive his Reglan from February 11-15, 2021, October 23-27, 2021, and August 5-9, 2022. (*Id.*) Jackson claims Gomez responded to these delays with deliberate indifference. (Dkt. 179 at 11-15).

To succeed on a claim of deliberate indifference against a supervisor, such as a warden, "the supervisory official must have known of, facilitated, approved, condoned, or turned a blind eye to his subordinates' activity[.]". *Ollison*, 136 F.4th at 736. The plaintiff "must demonstrate that 'there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'" *Id.* (*quoting Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)). When an inmate sues prison officials who do not work on medical staff, "deliberate indifference can be shown with evidence that those employees ignored or interfered with a course of treatment prescribed by a physician." *McDonald*

*v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016). For example, in *McDonald v. Hardy*, the warden and assistant warden of the prison unilaterally cancelled low-cholesterol diet plans for all inmates at the prison. *Id.* at 891. The Seventh Circuit held, "given the diagnosis of a serious medical condition and the interference by [the wardens] with a physician's assessment [], a jury reasonably could infer that [plaintiff] was, and continues to be, harmed[.]" *Id.* at 892. In *Gray v. Hardy*, the Seventh Circuit similarly found a jury could reasonably infer a warden's deliberate indifference when an inmate alleged inhumane living conditions in his cell caused him physical and psychological harm. 826 F.3d 1000 (7th Cir. 2016). The inmate provided evidence of grievances discussing, among other things, the prison's ongoing infestation of cockroaches, mice, "spiders, flies, gnats, moths, and mosquitos" that the warden failed to properly address. *Id.* at 1009.

Gomez's conduct, unlike the wardens in *McDonald* and *Gray*, does not demonstrate sufficient culpability. First, Gomez acted on the complaints he received regarding Jackson's missing medication. On October 28, Gomez received an email regarding Jackson's medical concerns. (Dkt. 159 at 10). In response to the email, Gomez forwarded the complaint to Osborne, the assistant warden who oversaw the medical care provided to inmates, and requested he check on Jackson's medication concerns. (Dkt. 159, Ex. 7 at 105); *see Figgs v. Dawson*, 829 F.3d 895 (7th Cir. 2016) (holding a warden does not demonstrate deliberate indifference when they consult with supervising officials who have the authority to resolve the concern). The DON at the time informed Osborne and Gomez that Jackson had ultimately received care from a physician the day before Gomez received the email and had another hospital appointment the following morning. (Dkt. 159, Ex. 11); *Thornton v. Godinez*, 720 F. App'x 762, 764 (7th Cir. 2017) (recognizing "no reasonable jury could find" non-medical prison officials "acted with deliberate indifference[]" when they directed the proper grievance official to investigate an inmate complaint as the officer

"appropriately considered the grievance urgent, investigated immediately, and relied on the reports of medical staff that [plaintiff] was receiving the care he needed."); *see also Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (stating non-medical prison officials, when made aware of an inmate's medical conditions, do not act with deliberate indifference when they ensure the inmate has access to medical care).

Again, on December 13, when Gomez received an email relating to Jackson's grievance, he forwarded the email to Galindo, who oversaw the HCU. (Dkt. 159, Ex. 11); *Diaz v. Godinez*, 693 F. App'x 440, 444 (7th Cir. 2017) (holding "prison administrators who are not part of the medical team have acted appropriately if they have referred the issue to medical staff who could be expected to address it."). That same day, Galindo informed Gomez that the HCU had properly resolved the issue. (Dkt. 181, Ex. 1). Jackson's requests did not fall on deaf ears as Gomez delegated medical concerns to the proper prison officials. Jackson, once again, failed to introduce evidence from which a reasonable jury could conclude Gomez acted with deliberate indifference. *Christensen v. Weiss*, 145 F.4th 743, 752 (7th Cir. 2025) (recognizing plaintiffs have a "high hurdle" to overcome with claims of deliberate indifference).

**b. Lucesita Galindo**

Jackson similarly brought a deliberate indifference claim against Galindo for receiving notice of his prescription problems and failing to resolve them. Once again, Jackson must put forth evidence that Galindo "'*actually* knew of and disregarded a substantial risk of harm.'" *Dean*, 18 F.4th at 241 (*quoting Petties*, 836 F.3d at 728). The parties do not dispute that Galindo knew about Jackson's medication concerns. (Dkt. 195 at 10). Galindo admits to having interacted with Jackson multiple times where he raised concerns about his medication delays. (*Id.*) The crux of Jackson's

Eighth Amendment claim against Galindo again rests on raising a dispute of fact over her mental culpability. Jackson, for the third and final time, fails to do so.

The deliberate indifference standard is "essentially a criminal recklessness standard." *Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019). No jury could find that Galindo's actions equate to criminal recklessness. Galindo worked at Stateville as the HCUA for IDOC from September 1, 2020, until October 1, 2022. During her time as HCUA, Jackson experienced delays in receiving his medication; Jackson did not receive his Protonix from August 12 to August 16 of 2021, September 28 to September 29 of 2021, and October 23 to October 27 of 2021 and he did not receive his Reglan from February 11 to February 15 of 2021, October 23 to October 27 of 2021, and August 5 to August 9 of 2022. (Dkt. 195 at 3). Despite putting Galindo on notice, Jackson alleges Galindo failed to use her authority to resolve the prescription delays, showing deliberate indifference. (Dkt. 179 at 13).

Plaintiffs face a high hurdle in establishing a claim of deliberate indifference. *Balle v. Kennedy*, 73 F.4th 545, 553 (7th Cir. 2023) (*citing Stockton*, 44 F.4th at 615) ("[d]eliberate indifference occupies a space slightly below intent and poses a high hurdle and an exacting standard requiring something approaching a total unconcern for the prisoner's welfare in the face of serious risks."). Viewing the evidence in the light most favorable to Jackson, Galindo's undisputed actions in response to Jackson's complaints cannot support a finding of deliberate indifference.

On August 19, 2021, Galindo emailed Osborne to inform him that Jackson's medication concern had been resolved because Jackson had his medication. (Dkt. 180 ¶ 44). On September 23, 2021, in response to a message from the Director's Office of the IDOC regarding Jackson's medication concerns, Galindo reached out to Osborne again for guidance. (Dkt. 159, Ex. 7 at 90);

*see Diaz*, 693 F. App'x at 444 (non-medical prison administrators can refer concerns to proper medical officials). Jackson also admits on September 24, 2021, Galindo wrote to him about their discussion on switching his medication to KOP. (Dkt. 180 ¶ 44). Once the medication switched from DOT to KOP, Jackson stated his prescription problems improved. (Dkt. 159, Ex. 1 at 121). That same day, Galindo replied to Gomez, informing him and other members of the medical team that Jackson had received his medication, which was delayed because a physician had to renew the prescription. (*Id.*, Ex. 11). Additionally, in response to wider issues with medication delays, when Galindo worked at Stateville, the HCU created a new prescription process to help alleviate delays where the HCU received a monthly report on what medications had nearing expiration dates. (Dkt. 195 at 11).

The evidence provided by the IDOC defendants indicated Galindo actively responded to Jackson's medical concerns. The Court does not need to decide whether Galindo could have done more in response to Jackson's complaints. Because Galindo's actions do not demonstrate she acted in a manner akin to "criminal recklessness[,]" the Court grants IDOC defendants' motion for summary judgment with respect to Jackson's deliberate indifference claim against Galindo. *Whitfield v. Spiller*, 76 F.4th 698, 714 (7th Cir. 2023).

## CONCLUSION

The Court grants the Wexford defendants' motions for summary judgment in their entirety. (Dkt. 154). The Court also grants the IDOC defendants' motions for summary judgment in their entirety. (Dkt. 157).

Virginia M. Kendall
United States District Judge

Date: September 22, 2026